**LAMBERT'S POINT DOCKS, INC., and Midland Insurance Company, Petitioners,**

**v.**

**Jerry HARRIS, and Director, Office of Workers, Compensation Programs, United States Department of Labor, Respondents.**

No. 82–1749.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1983.

Decided Sept. 29, 1983.

Rehearing and Rehearing En Banc Denied Nov. 4, 1983.

John B. King, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for petitioners.

Lee E. Wilder, Norfolk, Va. (John H. Klein, Breit, Rutter & Montagna, Norfolk, Va., T. Timothy Ryan, Jr., Sol. of Labor, Donald S. Shire, Associate Sol., Joshua T. Gillelan, II, U.S. Dept. of Labor, Washington, D.C., on brief), for respondents.

Before WIDENER, HALL and MURNAGHAN, Circuit Judges.

WIDENER, Circuit Judge:

Lambert's Point Docks, Inc., and its insurer petition for review of a decision of the Benefits Review Board. The Board affirmed in part the decision of the Administrative Law Judge (ALJ), who awarded benefits to Jerry Harris pursuant to The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. The petitioners contend that the ALJ's decision was not based on substantial evidence in the record considered as a whole and applied incorrect legal standards in making the award and in rejecting the petitioners' defense under 33 U.S.C. § 908(f). We find these contentions without merit and affirm the decision of the Board.

On April 10, 1978, Jerry Harris was working at his part-time job for Lambert's Point Docks, Inc. He was lifting and stacking bales of straw mats, when he twisted his back and heard a popping sound. Harris sat or fell back and could not move.

Harris was taken to a hospital, where he was treated by an orthopedic surgeon, Dr. Young, for a compression fracture of the eleventh thoracic vertebra (T11). X-ray photographs of the spine revealed, in addition to the fracture, a disease process at T11. The pre-existing disease had caused osteoporosis, a demineralization of the vertebra, which made Harris more susceptible to the compression fracture. The X-ray reports also found spina bifida occulta, a congenital condition, which results from incomplete formation of the spinal canal. Harris, however, had never before injured his back.

Harris remained in the hospital from April 10 to April 27, 1978, during which time he was treated conservatively with the use of traction. After his release from the hospital, Harris wore a back brace and received outpatient treatment from Dr. Young. Dr. Young continued regularly to take X-ray photographs, which showed the fracture in the process of healing. The compression, however, still remained and caused a kyphosis or forward curvature of the thoracic spine. On August 23, 1978, Dr. Young gave Harris permission to return to his full-time job in the bakery of Colonial Stores. Harris never returned to his longshoring job because of back pain he continued to suffer.

Several months after returning to work, Harris began to experience pain in his back and trouble with his legs. Although X-ray plates of T11 showed continued healing, Harris complained of pain and numbness and weakness in his legs. In early June 1979, Harris had to leave work when his legs were giving out on him. X-rays showed an increase in, and a spread of, the osteoporosis to the facets of the T11 vertebra. The compression of T11 remained the same. Because Harris' condition was symptomatic of a neurological deficit, Dr. Young referred Harris to Dr. Rashti, a neurosurgeon.

Dr. Rashti observed that Harris had difficulty walking and showed a spasticity in his lower legs. Harris complained of discomfort in his legs, a tightness sensation, and some back pain. X-ray studies showed the previous compression fracture and other pathological developments, such as the disintegration of the remainder of the vertebral body elements. Myelography showed complete blockage of the spinal canal at T11.

On July 10, 1979, Dr. Rashti performed a laminectomy to decompress the spinal cord at T11. The laminectomy was performed at T10, T11, and T12. During the surgery, Dr. Rashti could see that the posterior elements of the spine were abnormally thin and friable and were obviously involved by some pathological process. Dr. Young, who was also present, removed a good deal of the posterior bony elements, revealing an underlying tumor. More bone, which was

structurally unsound, had to be removed to get at some of the tumor mass. A tumor process had encroached on the vertebral body of the lamina and on the spinal cord, compressing the cord. The surgeons removed the tumor from behind and the side of the spinal canal, but they could not reach the tumor mass in front of the cord. A frozen section of the tumor showed plasmocytoma, a form of cancer, which appeared localized in the bone at T11.

Because the surgeons had to remove the posterior elements of the vertebral body, Harris' back was left totally unstable at T11. Dr. Young stabilized the spine with Herrington rods on both sides of the spinal canal.

Following surgery, Harris' neurological symptoms gradually cleared, although some residual spasticity remained. Harris was fitted with a body jacket for additional back support and was given local X-ray treatment for the cancerous tumor mass remaining at T11. Harris continued this X-ray treatment on an outpatient basis after he left the hospital on August 3, 1979.

Since his release from the hospital, Harris has been out of work. Although the Herrington rods and the external brace provide some stability to his back, Harris' back remains too unstable to allow him to return to the labor which had been the whole means of his livelihood before he reentered the hospital in July 1979. Harris' primary disability after surgery was related to the instability of his back.

The ALJ found that Harris' disability resulted from a combination of a work-related accidental injury and a pre-existing disease condition, and the Benefits Review Board concluded that the ALJ's finding is supported by substantial evidence in the record considered as a whole. 33 U.S.C. § 921(b)(3); *O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*, 380 U.S. 359, 362–63, 85 S.Ct. 1012, 1014–15, 13 L.Ed.2d 895 (1965).

■ Benefits should be denied only when it would be unreasonable to say that an injury or disability arose out of claimant's employment. *See O'Keeffe, supra* (noting the humanitarian nature of the Act as evidenced by the presumptions in favor of the claimant in 33 U.S.C. § 920(A) ). A work-related injury need not be the sole cause of the claimant's disability to come within the scope of the Longshoremen's and Harbor Workers' Compensation Act. The accidental injury is compensable if it aggravates, accelerates, or combines with a previous infirmity. *Newport News Shipbuilding and Dry Dock Co. v. Fishel*, 694 F.2d 327, 329 (4th Cir.1982).

■ In their deposition testimony, both Dr. Young and Dr. Rashti stated that Harris would not have sustained a compression fracture of the vertebra at T11 if the bone had not been affected by the pre-existing disease. Dr. Rashti testified that the cancer was responsible for the compression fracture. Dr. Young expressed no opinion on whether the tumor process predated the compression fracture. In Dr. Young's view, the osteoporosis that pre-existed the fracture could have resulted from Harris' congenital bone abnormalities.

Dr. Rashti explained in his testimony that the stability of the spine derives from the same principle that makes a tripod stable. Each vertebra rests on three pressure bearing points: at one point there is a vertebral body, and at the other two there are facets. If any one or two of these weight bearing points is eliminated, there may be some stability left in the spine. When all three points are eliminated, the spine becomes unstable and vulnerable to slippage, which may injure the spinal nerves, the cord, and the other surrounding structures.

Dr. Rashti further explained that although the compression fracture at T11 would have healed and become structurally sound, the broken vertebral body in Harris never fully healed. Hence, one of the three necessary supports in the vertebra was absent even before the laminectomy. During the operation on Harris' back, the surgeons found that both facets had been involved by the tumor process. These parts of the vertebra were removed, but the amount of bone removed would not have made a nor-

mal back unstable. If the disease had affected these two structures alone (because the vertebral body had never been fractured or because it had healed fully), there would have been some degree of instability in the spine, but Harris may not have needed the Herrington rods. Because all three pressure bearing points were eliminated, Harris' back had become so unstable that he needed the rods and still his back was too unstable for him to return to work.

Dr. Rashti concluded, therefore, that the compression fracture, which Harris sustained on the job, contributed significantly to the instability of his back; the unhealed fracture was a contributing cause of the subsequent instability, and thus of Harris' disability. Accordingly, we conclude that the finding of the ALJ that Harris' disability results from his longshoring activities on April 10, 1978, is based on substantial evidence in the record considered as a whole. *Fishel,* supra.

■ Before the ALJ and the Board, the petitioners urged that if Harris is permanently totally disabled, then they are entitled to a limitation of liability under 33 U.S.C. § 908(f). This section operates to shift liability for compensating the injured employee in so-called second injury cases from the employer to a special fund, established under 33 U.S.C. § 944, after the employer has provided compensation for a certain number of weeks.

One of the major purposes of the second injury fund is the prevention of employer discrimination against previously disabled, or partially disabled, handicapped workers. *Lawson v. Suwanee Fruit & S.S. Co.,* 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611 (1949). By limiting an employer's liability, sections 908(f) and 944 remove a substantial disincentive from hiring workers with an increased risk of total disability.

The scope of this limitation of liability is itself limited by its underlying purpose. Not all pre-existing conditions, but only those that are manifest at the time of the employment, will serve to limit an employer's liability. A pre-existing condition that is not manifest cannot serve to limit the employer's liability. *Dellingham Corp. v. Massey,* 505 F.2d 1126, 1128 (9th Cir.1974). This point of law is not contested.

■ The limitation of liability is thus only available to employers who hire handicapped or partially disabled workers whose previous condition is known or manifest. Because of the difficulty in proving the employer's knowledge of a latent disability, it has been held that the employer may come under the scope of the second injury fund if the knowledge of the pre-existing condition was available to the employer at the time employment began. The Third Circuit, in applying these principles, held that, even absent actual knowledge, an employer was covered by the fund when an extant medical record revealed the pre-existing condition and was discoverable by the employer. *Director, Office of Workers' Compensation Programs v. Universal Terminal & Stevedoring Corp.,* 575 F.2d 452, 456–57 (3d Cir.1978).

■ The petitioners urge that the Third Circuit's holding be extended to limit the liability of an employer who did not have actual knowledge of the pre-existing condition, as here, and who had no available extant medical record, but who could have known if the proper diagnostic test had been conducted. We decline to hold that a pre-existing disease is manifest when it might have been discovered by proper diagnosis but had not been. Because there was no extant medical record revealing the condition of Harris' back, we do not find it necessary to consider, and do not express an opinion on, whether or not the Third Circuit rule in *Union Terminal* would be applied in this circuit.

■ The determination of the manifestations of an employee's pre-existing condition is a factual one for the ALJ. The ALJ properly rejected the petitioners' contention that had X-rays been taken of Harris' back before his work-related accident, they would have revealed and made manifest the diseased condition of his vertebra. The ALJ found that there was no evidence of any manifestation of the pre-existing condi-

tion before Harris injured his back on April 10, 1978. Harris had never before injured his back, and there was no X-ray or other extant evidence of osteoporosis before the accident. The ALJ's finding is supported by substantial evidence in the record considered as a whole.

The decision of the Benefits Review Board is accordingly

AFFIRMED.